# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JASON MCMANUS HOLTZMAN, as Trustee of the Elizabeth McManus Holtzman Irrevocable Trust, et al | : : : : | CIVIL ACTION |
| | : | 22-cv-0122-JMY |
| v. | : : : | |
| PHILADELPHIA MUSEUM OF ART | : : | |

## MEMORANDUM

**YOUNGE, J.**                                                                 **JULY 7, 2022**

Plaintiffs Jason McManus Holtzman, Jackie McManus Holtzman, and Madalena McManus Holtzman, as Trustees of the Elizabeth McManus Holtzman Irrevocable Trust ("Plaintiffs") instituted an action in state court to recover a 1926 painting by Dutch artist Piet Mondrian from Defendant Philadelphia Museum of Art ("PMA") known as Schilderij No. 1, 60 x 60 cm ("the Painting"). Plaintiffs alleged the timeliness of their action pursuant to the Holocaust Expropriated Art Recovery Act ("HEAR Act") of 2016, Pub. L. No. 114-308, 130 Stat. 1524. Pursuant to 28 U.S.C. § 1441(a), PMA timely removed this case to this Court on January 11, 2022 on the basis that Plaintiffs' reference to the HEAR Act raised a federal question. (ECF No. 1.) Plaintiffs moved to remand, (ECF No. 11), arguing its reference to the HEAR Act is inadequate to confer jurisdiction. For the foregoing reasons, we deny Plaintiffs' motion to remand and conclude their complaint raises a federal question such that subject matter jurisdiction is proper.

I.     BACKGROUND

   A.     Factual Background

Piet Mondrian, a leading innovator in abstract art, is regarded as one of the greatest artists of the 20th century. (Plaintiffs' Complaint ("Compl."), as attached to PMA's Notice of Removal, ECF No. 1, Exhibit A at ¶ 2). Mondrian was born in the Netherlands in 1872. (The Tate, https://www.tate.org.uk/art/artists/piet-mondrian-1651 (last accessed July 1, 2022).) He later moved to Paris, where he resided from 1919 to 1938. (Compl. at ¶ 11.) During this time in Paris, Mondrian was influenced by other abstract artists and began to develop his distinctive style of painting: white backgrounds with thin black lines, and blocks of primary colors. (*Id*. at ¶ 11.) In 1926, while residing in Paris, Mondrian created the Painting (Schilderij No. 1) along with other similar works in a series which bear Mondrian's signature Cubist style. (*Id*. at ¶ 12; *see also* Wikipedia, https://en.wikipedia.org/wiki/Piet_Mondrian (last accessed July 1, 2022).)

After the Painting's creation, Mondrian consigned it to Sophie Küppers, a prominent art dealer to whom Mondrian consigned many works. (*Id*.) In 1927, Küppers left Germany and joined her husband in the Soviet Union. (*Id*. at ¶ 13.) At the time of her emigration, she had not sold the Painting. (*Id*.) Küppers entrusted the Painting (along with several others by different artists) to the director of a museum in Hanover, Germany (the "Hanover Museum"), where she previously loaned her own Mondrian painting. (*Id*.)

By 1937, after the Nazis had consolidated their control of Germany, Adolf Ziegler, the president of the Reich Chamber of Fine Arts, spearheaded the purging of modern art and artists. (*Id*. at ¶ 16.) The Nazis labeled the artwork and the artists themselves, including Mondrian, as "Entartet," or degenerate.[1] (*Id*. at ¶ 16, 18.) Joseph Goebbels, Reich Minister of Public

---

[1] Degenerate art encompassed multiple styles of artwork across many kinds of media (not just paintings). Prevailing Nazi ideology eschewed Modernism, which they termed "monstrosities of madness," and embraced more traditional

Enlightenment and Propaganda, authorized Ziegler to select and secure degenerate art owned by the Reich, provincial governments, or municipalities to be included in an exhibition open to the German public.[2] (*Id*. at ¶ 18.) The exhibition included Mondrian's paintings and others which were seized from the Hanover Museum (though not the Painting). (*Id*.)

In August 1937, the Painting was seized from the Hanover Museum. (*Id*. at ¶ 20.) In preparation for the seizure, the Hanover Museum took photographs of the artwork. (*Id*.) The back of the photograph of the painting designated the Painting as a loan. (*Id*.) On August 11, 1937, the Hanover Museum's acting director sent the photographs to Amtes für Volksbuilding (the Office for Popular Education), along with a list of "degenerate" art to be seized. (*Id*.) The list included the Painting, and identified it as a "loan" and "property of the artist." (*Id*.)

Once seized, Nazi agents shipped the Painting and stored it in Niederschönhausen in Berlin, Germany.[3] (*Id*. at ¶ 21.) Deeming it commercially profitable, the Reich transferred possession of the Painting to Karl Buchholz, one of the Reich's art dealers appointed to sell "degenerate" art. (*Id*. at ¶ 23.) Buchholz sent the painting to his New York-based business partner, Curt Valentin, who was also authorized by the Reich to sell degenerate art. (*Id*.) Valentin sold the artwork to a New York City collector, Albert Gallatin. (*Id*. at ¶ 24.)

In September 1938, Mondrian left Paris for London due to the growing threat of fascism in Continental Europe. (*Id*. at ¶ 22.) Approximately two years later, he fled to New York under the

---

forms of art that depicted their philosophical, political, and moral goals. *See* The Tate, https://www.tate.org.uk/art/art-terms/d/degenerate-art (last accessed July 1, 2022).

[2] In July 1937, Nazis organized an exhibit of the so-called degenerate art with the goal of convincing Germans that modern art was a "perversion created by sick minds," in addition to shaming the artists. (*Id*. at ¶ 18.) Entitled "Entartete Kunst," the exhibition included approximately 600 important pieces of artwork that were previously in the possession of several German public museums. (*Id*.; *see also* The V&A, Entarte Kunst: The Nazi's Inventory of Degenerate Art, https://www.vam.ac.uk/articles/entartete-kunst-the-nazis-inventory-of-degenerate-art (last accessed July 1, 2022))

[3] Many "degenerate" pieces of artwork were stored in this location. The Reich prepared an inventory of all seized artworks with corresponding inventory numbers. (*Id*. at ¶ 21.) The inventory numbers were either applied with red or blue crayon onto the paintings' frames. (*Id*.) The Painting still bears its inventory sticker. (*Id*.)

sponsorship of his close friend and colleague Harry Holtzman, an abstract painter whom Mondrian had met in Paris. (*Id*. at ¶¶ 22, 28.) While in London and New York, Mondrian continued to create artwork in his notable Modernist style. (Wikipedia, https://en.wikipedia.org/wiki/Piet_Mondrian (last accessed July 1, 2022).) In or around December 1940, Mondrian restored the painting for Gallatin in New York. (*Id*. at ¶ 27.)

On February 1, 1944, Mondrian died of pneumonia. (*Id*. at ¶ 29.) In his will dated April 16, 1942, Mondrian devised and bequeathed "all works pictures drawings and writings of mine and all my other property real personal and mixed and whatsoever situated to my friend Harry Holtzman." (*Id*. at ¶ 30.) In 1952, Gallatin, who had been in exclusive possession of the Painting since its purchase from Valentin, bequeathed the painting to the PMA. (*Id*. at ¶ 31.) Since this transfer, the Painting has remained at the PMA until present day. (*Id*. at ¶ 32.)

Following the atrocities suffered during World War II, it was of particular concern to the allies and world leaders that they rectify the Nazi's prolific looting and seizure of property. On several occasions prior to its possession of the Painting, the PMA received directives and warnings regarding misappropriated art from the Nazi era. (*Id*. at ¶ 34.) In 1945, the American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas (the "Roberts Commission") encouraged museums, art dealers, and auction houses to be wary of objects and artwork with obscure or suspicious provenances. (*Id*. at ¶ 35.) In 1947, the Department of State highlighted the responsibility of museums and other American institutions to exercise "continued vigilance" in identifying cultural objects with tainted provenances. (*Id*. at ¶ 36.) The actions of the PMA also fall under the umbrella of the Washington Conference Principles on Nazi-Confiscated Art and the Terezin Declaration on Holocaust Era Assets and Related Issues, which were both designed to facilitate the return of Nazi-looted art to its original owners. (*Id*. at ¶ 38.)

On September 25, 1987, Harry Holtzman died, and was survived by his wife, Elizabeth McManus Holtzman and his three children, the Plaintiffs. (*Id*. at ¶ 40.) In November 1991, Elizabeth McManus Holtzman created a trust ("the Trust"), delivering the remainder of Holtzman's estate to the Plaintiffs as trustees. (*Id*. at ¶ 41.) Following Elizabeth McManus Holtzman's death, Plaintiffs allege that the Trust holds the remainder of Mondrian's estate. (*Id*. at ¶ 41.)

In 2016, Dr. Monika Tatzkow, a provenance researcher, and Gunnar Schnabel, a German attorney and researcher, independently researched the provenance of other Mondrian paintings belonging to Küppers and Lissitzky that were lost during the Nazi era. (*Id*. at ¶ 42.) They approached Plaintiffs, offering to investigate the provenance of paintings consigned by Mondrian, which Plaintiffs retained them to do. (*Id*. at ¶ 42.) After researching the history and provenance of the Painting, Tatzkow and Schnabel concluded the PMA never lawfully acquired its ownership since it belonged to Mondrian at the time of the Nazi's wrongful seizure. (*Id*. at ¶ 43.) These expert opinions were submitted to PMA in 2018, followed by a demand for the Painting's return. (*Id*. at ¶¶ 45, 46.) In 2021, PMA, through its counsel, rejected Plaintiffs' demand. (*Id*. at ¶ 47.)

### B.     Procedural Background

On December 10, 2021, Plaintiffs filed their complaint in the Philadelphia Court of Common Pleas. (Phila. Ct. Comm. Pls. Dkt # 211200082). In their complaint, Plaintiffs allege the aforementioned factual background, and three counts seeking PMA's return of the Painting to the Trust, along with Pennsylvania state claims for replevin, conversion, and unjust enrichment. (Compl. at ¶¶ 52-57, 58-61, and 62-67.) Plaintiffs also request a declaratory judgment stating that all right, title, and interest in and to the Painting is vested in Plaintiffs. (*Id*. at ¶¶ 68-72.)

Plaintiffs claim their lawsuit is timely pursuant to the HEAR Act, which provides for a longer statute of limitations than under Pennsylvania state law. (Id. at ¶¶ 48-51.) In particular, the HEAR Act states, in relevant part, that "a civil claim or cause of action against a defendant to recover any artwork . . . that was lost during the covered period because of Nazi persecution may be commenced not later than 6 years after the actual discovery by the claimant or the agent of the claimant of the identity and location of the artwork . . . and a possessory interest of the claimant in the artwork or other property." (*Id*. at ¶ 49 (citing HEAR Act § 5(a)).) Plaintiffs allege the Painting was lost during the covered period due to the Nazi's persecution of "degenerate" art and artists; thus, its claims are timely based on the extended filing deadline afforded by the HEAR Act. (*Id*. at ¶¶ 50, 51.)

PMA filed a notice of removal January 11, 2022, claiming federal jurisdiction exists because there are substantial, federal issues in dispute raised that are capable of resolution by this Court without disrupting the federal-state balance. (PMA's Notice of Removal ("Removal"), ECF No. 1.) It argues federal jurisdiction exists over a claim sounding in state law if the federal issue is "(1) necessarily raised; (2) actually disputed; (3) substantial; and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." (Removal at ¶ 10 (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005)).) Specifically, PMA alleges that Plaintiff's reliance on the HEAR Act raises a federal question since their ability to obtain relief depends on the Act's interpretation and application, and if it extends the statute of limitations to Plaintiffs' claims. Whether the Act extends the statute of limitations turns on whether the it applies to expropriated works of art from artists like Mondrian, who was neither a citizen of Germany nor any German-ruled territory at the time of the alleged expropriation of the Painting, and who was not alleged to be persecuted individually by the Nazi regime. (*Id*. at

¶¶ 7-9.) Further, PMA claims this Court will be faced with deciding whether the HEAR Act precludes the equitable defense of laches, given that the Act preempts only "defense[s] at law" and that this disputed issue also warrants federal question jurisdiction. (*Id*. at ¶ 9 (citing HEAR Act § 5(a)).)

PMA further alleges the issues raised in Plaintiffs' complaint satisfy the conditions required for federal question jurisdiction as set forth in *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). It argues the application of the HEAR Act is actually disputed, since the heart of its contentions deal with the parameters of the Act. (*Id*. at ¶ 13.) It alleges the issues are substantial since determining the Act's application to expropriations of artwork such as the Painting is important for future actions, as is the Act's effect on state laches defenses. (*Id*. at ¶ 16.) Lastly, it argues the resolution of these issues will not disrupt the balance of federalism approved by Congress, since one of the Act's purposes is to create a "uniform, nationwide" limitations period for suits seeking to recover certain works. (*Id*. at ¶ 15 (citing *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 192 (2d Cir. 2019)).)

Plaintiffs moved to remand the action back to state court on February 28, 2022. (Plaintiffs' Motion to Remand, ECF No. 10; Memorandum in Support of Plaintiffs' Motion to Remand ("MTR"), ECF No. 11.) Plaintiffs argue the HEAR Act is not necessarily raised since the Act merely extends the time by which a party meeting its requirements may bring a claim. (*Id*. at 7 (citing HEAR Act § 3(2) ("[it] shall [not] be construed to create a civil claim or cause of action under Federal or State law.")).) Plaintiffs suggest they may alternatively rely on state statutes of limitations. (*Id*. at 6, 7.) Moreover, Plaintiffs claim that its reference to the HEAR Act and whether it preempts PMA's affirmative defense is merely a tangential issue. (*Id*. at 8.)

Plaintiffs further argue PMA is unable to satisfy the remaining three *Grable* factors. (*Id*. at 9-13.) They explain the text of the HEAR Act is not in actual dispute, as only its application is questioned. (*Id*. at 10.) The Act's application is not a substantial question by virtue of Congress' decision to decline federal jurisdiction in choosing not to create a cause of action or preempt claims brought under state law. (*Id*. at 11.) Lastly, Plaintiffs argue this Court's resolution of the presented issues would flout or undermine congressional intent to confer jurisdiction under statutes for which there is no explicit federal cause of action. (*Id*. at 12.)

PMA filed a response to Plaintiffs' motion to remand. (Opposition to Motion to Remand ("Opp."), ECF No. 12.) PMA contends Plaintiffs "barely address a central and dispositive legal issue for their case: whether the claims they filed . . . are timely." (*Id*. at 1.) PMA reasserts that the application of the Act is necessarily raised because its interpretation "bears upon" Plaintiffs' right to relief pursuant to state law claims. After explaining the backdrop against which the HEAR Act was created, PMA explains that its stated purpose was to "ensure that laws claims to Nazi-confiscated art . . . further[s] United States policy," and honor the federal government's previous commitments and legislative actions. (*Id*. at 3-5.) In passing the Act, Congress exercised its authority over foreign affairs, including its authority to resolve war-related crimes. (*Id*. at 7.) Since the resolution of Plaintiffs' claims will depend on the application of the Act, which in turn requires legal determinations raising important questions of foreign policy, PMA reasserts a federal issue is still necessarily raised. (*Id*. at 8.)

Further, PMA reasserts the application of the Act implicates substantial federal issues since it promotes important federal interests as stated in the Act itself. *(I*d. at 13.) Though the PMA will dispute its application, such an inquiry into the limits of the Act invokes important federal interests since it will raise questions as to whose property rights were affected by the Holocaust and whether

reparations are warranted. (*Id*. at 14.) Not only are these federal interests important, they are exclusive to the federal forum. (*Id*. (citing *Von Saher v. Norton Simon Museum of Art*, 592 F.3d 954 (9th Cir. 2010)).) Federal courts have readily concluded that removal is proper where a state cause of action necessarily turned on issues implicating international relations. (*Id*. at 15.)

Plaintiffs submitted a reply in further support of its motion to remand. (ECF No. 13.) Plaintiffs debate PMA's application of the *Grable* factors, and urges that a court must look at the elements of the state law causes of action to determine whether they turn on a construction of federal law. (*Id*. at 2.) Plaintiffs assert PMA fundamentally misconstrues this requirement. (*Id*. (citing *MHA LLC v. HealthFirst, Inc*., 629 F.App'x 409, 413 (3d Cir. 2015) (finding reliance on Medicare market rates in unjust enrichment/quantum meruit action does not necessarily raise a federal issue)).)

PMA filed a sur-reply on April 13, 2022. (Sur-Reply in Opposition to Plaintiffs' Motion to Remand ("Sur-Reply"), ECF No. 14). PMA again asserts that determining the application of the HEAR Act, along with the questions such an inquiry raises, will be of central importance to this litigation. (*Id*. at 3.) Such issues are exclusive to the federal system, and thus substantial. (*Id*.)

II.     **LEGAL STANDARDS**

Under 28 U.S.C. § 1441(a), a defendant may remove a civil action filed in a state court if the federal court would have had original jurisdiction over the action. Section 1441(a) provides: "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." "The defendant[] bear[s] the burden of establishing removal jurisdiction and compliance with all pertinent procedural requirements." *Winnick v. Pratt*, No. 03- 1612, 2003 WL 21204467, at *1

(E.D. Pa. May 20, 2003) (citing *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990)). Once an action is removed, a plaintiff may challenge removal by moving to remand the case back to state court. *Cook v. Soft Sheen Carson, Inc.*, No. 08-1542, 2008 WL 4606305, at *1 (D.N.J. Oct. 15, 2008). Remand to the state court is appropriate for: "(1) lack of district court subject matter jurisdiction or (2) a defect in the removal process." *PAS v. Travelers Ins. Co.*, 7 F.3d 349, 352 (3d Cir. 1993). Federal courts have subject matter jurisdiction over state-law claims that raise a question of federal law if the federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (citing *Grable*, 545 U.S. at 313-14). Remand is mandatory and can occur at any time during the litigation if the court determines that it lacks federal subject matter jurisdiction. *Kimmel v. DeGasperi*, No. 00-143, 2000 WL 420639, at *1 (E.D. Pa. Apr. 7, 2000) (citing 28 U.S.C. § 1447(c)). Upon a motion to remand, "it is always the removing party's burden to prove the propriety of removal, and any doubts about the existence of federal jurisdiction must be resolved in favor of remand." *Lumbermans Mut. Cas. Co. v. Fishman*, No. 99-0929, 1999 WL 744016, at *1 (E.D. Pa. Sep. 22, 1999) (citing *Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 851 (3d Cir.1992)); *see also Boyer*, 913 F.2d at 111 (stating removal statutes "are to be strictly construed against removal and all doubts should be resolved in favor of remand").

**III.   DISCUSSION**

    **A.   The Application of the HEAR Act is "Necessarily Raised"**

Where a federal issue is not explicitly raised but rather embedded in a state law claim, federal jurisdiction exists "only if that question 'is a necessary element of one of the well-pleaded state claims.'" *United Jersey Banks v. Parell*, 783 F.2d 360, 366 (3d Cir. 1986). Federal issues are

necessarily raised where "vindication of a right under state law must necessarily turn on some construction of federal law." *Manning v. Merrill Lynch Pierce Fenner & Smith, Inc*., 772 F.3d 158, 163 (3d Cir. 2014), aff'd, 578 U.S. 374 (2016); *see also Goldman v. Citigroup Glob. Mkts. Inc.*, 834 F.3d 242, 249 (3d Cir. 2016) (federal subject matter jurisdiction exists where "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law") (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal*., 463 U.S. 1, 27-28 (1983)). A court must look at the elements of the state causes of action to examine whether they turn on a construction of federal law. *City of Greensburg v. Wisneski*, 75 F. Supp. 3d 688, 694 (W.D. Pa. Jan. 8, 2015). In other words, a federal issue is necessarily raised where "an element of the state law claim requires construction of federal law." *MHA LLC v. HealthFirst, Inc.*, 629 F. App'x 409, 412-13 (3d Cir. 2015).

The Third Circuit examined whether a federal issue was necessarily raised in *Manning, supra*. Shareholder-plaintiffs filed a lawsuit in New Jersey state court, alleging defendants' conduct violated state securities laws. *Manning*, 772 F.3d at 160. Plaintiffs repeatedly referenced certain unique federal securities regulations in their complaint, though declined to directly allege any federal cause of action. *Id*. Defendants removed the suit on the basis of federal question jurisdiction, and plaintiffs sought to remand. *Id*. at 162. The district court disagreed with the position taken by plaintiffs and retained jurisdiction, deciding that the case was premised upon, and its resolution dependent upon, alleged violations of a regulation promulgated under federal securities laws. *Id*. The Third Circuit reversed the district court's opinion, determining that plaintiffs' legal theories were not predicated on any federal regulation, nor was a determination of federal law embedded within plaintiffs' claims. *Id*. at 163. Rather, the Court explained that as

plaintiffs' claims could "rise or fall" based entirely on the construction of state law, there was no federal question jurisdiction. *Id*. at 165.

We agree with PMA that the vindication of Plaintiffs' claims depends on the interpretation of federal law. Unlike in *Manning*, Plaintiffs' claims cannot proceed unless a federal question is resolved. In *Manning*, the plaintiffs relied on federal securities law as a way to exemplify defendants' improper behavior; however, they alleged those misgivings had been perpetrated in violation of state law. They did not affirmatively plead that any portion of their claim depended on the interpretation of the regulations they mentioned, nor did the relief they requested ultimately entail the court's resolution of a federal issue. In contrast, Plaintiffs' claims entail the examination and interpretation of the HEAR Act as a part of their ultimate claim for relief, as the face of their complaint implicates issues regarding the Act's applicability. Namely, Plaintiffs rely on the Act to allege the timeliness of their allegations. Plaintiffs explicitly rely on the HEAR Act to maintain their action, stating that "[t]his action is timely pursuant to the HEAR Act," (Compl. At ¶ 48), the Painting was lost during the covered period, (*id*. at ¶ 50); Nazi persecution precipitated these events, (*id*.); and they have timely discovered their property rights within the designated period, (*id*. at 51). Plaintiffs couch their claims solely within the parameters of the HEAR Act and make no mention of state statutes of limitations.

Plaintiffs' version of events and its necessary vindication will certainly turn on a thorough investigation of the Act's application, and whether it applies to Plaintiffs' claims. Without resolving these issues, Plaintiffs cannot successfully claim to have any right to the Painting under state law. In its briefing, PMA repeatedly recites an inexhaustive list of issues to be resolved before Plaintiffs prevail on their claims, including the definition of "because of Nazi persecution," whether the Act extends to individuals who did not belong to any minority group persecuted by

the Nazi government, whether Modernist artists were a persecuted group, and whether Mondrian's place of residence, as well as the Painting's creation, bear any affect. (*See* Removal, ¶ 9; Opp., at 8-9; Sur-Reply, at 3.) This Court anticipates additional legal issues impacting the applicability of the Act, such as the terms of Mondrian's consignment of the Painting, whether the Painting was loaned to the German museum, and whether Gallatin was a bona fide purchaser of value. Further, outstanding issues such as the fate of Kuppers' own Mondrian painting, as well as Mondrian's own idea and recollection of the Painting's history may bear on the applicability of the Act. These issues are germane to the Act's pertinence, which in turn dictates the success of Plaintiffs' claims.

Even beyond the HEAR Act, Plaintiffs' state claims (and the elements inherent in adjudicating them) necessarily raise further issues that are a matter properly before this Court for its determination. In their complaint, Plaintiffs focus their historical narrative on the Painting's journey from its creation until the present day, detailing where it was created, delivered, consigned, stored, and sold. Plaintiffs' claims require them to establish good title in the Painting, and each of Plaintiffs' three legal theories plead their intention to prove as much. (Compl., ¶¶ 53, 59, 69 ("Plaintiffs are the rightful owners of the Painting and entitled to sole and immediate possession thereof"); ¶ 63 ("Plaintiffs are the rightful owners of the Painting").) As a logical ancillary, Plaintiffs also intend to prove PMA does not possess any property interest in the Painting, (Compl. at ¶ 54 ("Defendant never acquired ownership of the Painting but holds it only for the benefit of Mondrian and his successors in interest, including Plaintiffs")), and requests the deciding court declare as much. (Compl. at ¶ 69-72 ("Defendant does not have good title to the Painting"; "Defendant has no right, title, or interest in and to the Painting").) In arguing their rightful claim to the Painting, Plaintiffs will undoubtedly invoke certain international acts, treaties, and agreements that complement the HEAR Act in seeking the return of property back to victims of

the Holocaust and which are cited by the Act itself. *See* HEAR Act § 2(3), (5) (mentioning the Washington Conference Principles on Nazi-Confiscated Art and the Terezin Declaration). Evaluating such issues is within the exclusive domain of federal law. *See Sosa v. Alvarez-Manchin*, 542 U.S. 693, 730 (2004) ("For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations."); *Kashef v. BNP Paribas SA*, 442 F.Supp.3d 809 (S.D.N.Y. 2020) ("To be sure, courts have long recognized that international law is a part of federal, not state, law.") Therefore, we determine that the "necessarily raised" requirement is satisfied because the vindication of Plaintiffs' claims depend upon the interpretation of international acts, treaties, and agreements which are the province of the federal court and federal question jurisdiction.

   **B.**  **The Applicability of the HEAR Act is Actually Disputed**

  We agree with PMA that the applicability of the HEAR Act is "actually disputed." As stated above, Plaintiffs argue the HEAR Act applies, and extends the time in which they are able to bring their claims. (Compl., ¶ 48-51.) PMA intends to dispute the applicability of the HEAR Act, and contest Plaintiffs' alleged ability to avail themselves of the Act's extended filing deadline. (Removal, ¶¶ 10-15.) Plaintiffs' right to relief thus depends on the meaning of the HEAR Act, and how it applies to the instant situation. This dispute regarding the effect of law categorized in Section 1331 is exactly the type which this Court is imbued with the power to decide. *See Gunn, supra* ("This is just the sort 'dispute . . . respecting the . . . effect of [federal] law' that *Grable* envisioned."). Plaintiffs contend this prong is only satisfied where there is a dispute regarding the *meaning* of the statutory text, rather than its applicability. (*See* MTR, at 9-10.) Plaintiffs' attempt to split hairs is misguided, as we see no difference in the present case. PMA intends to dispute the applicability of the HEAR Act by contesting the meaning of several key phrases, which in turn dictates whether the Act applies. Since the meaning of the text determines its applicability, we

decline to adopt Plaintiffs' overly technical reading and decide the applicability of the HEAR Act is actually disputed.

        **C.**        **The Application of the HEAR Act Implicates Substantial Federal Issues**

To be "substantial," the issue must be significant "to the federal system," and not merely to only the parties. *Clayton v. Dollar Bank*, 2021 WL 4552966, at *8 (W.D. Pa. Oct. 5, 2021) (citing *MHA LLC v. HealthFirst, Inc.*, 629 F. App'x 409, 412–13 (3d Cir. 2015)). It takes more than the presence of a federal element "to open the 'arising under' door." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 701 (quoting *Grable*, 545 U.S. at 313). While a lack of a right of action under federal law may be construed as evidence against federal jurisdiction, *see Grable*, 545 U.S. at 318 (stating that a lack of a private right of action is "worth some consideration in the assessment of substantiality"), such an absence is not dispositive. *See Ali v. DLG Development Corp.*, 283 F.Supp.3d 347, 356 (E.D.Pa. Oct. 23, 2017).

We agree that interpreting and applying the HEAR Act raises issues of significance to the federal system, as it implicates questions of law and policy. Issues involving international relations are inherently federal, as are issues implicating the federal government's "power to wage and resolve war, including the power to legislate restitution and reparation claims." *Von Saher*, 592 F.3d at 967. The HEAR Act itself proclaims to promote interests important to our federal system, as one of its stated purposes is "[t]o ensure that laws governing claims to Nazi-confiscated art and other property further United States policy." HEAR Act § 3(1). Moreover, it reconfirms the United States' commitment to important pieces of its foreign policy and prior legislative actions, and confirms the United States' ongoing commitment to redressing victims of the Holocaust. HEAR Act § 3(1). Though the Parties are sure to dispute the applicability of the Act, its affect and influence on Holocaust reparations remains inescapable.

We are further convinced that interpreting and applying the Act implicates substantial federal issues based on case law which precipitated the Act. As pointed out by both Parties, the HEAR Act was passed in the wake of *Von Saher, supra*. There, the Ninth Circuit struck down a California statute extending the state's statute of limitations for actions to recover Holocaust-era artwork by ruling that the statute was preempted under the foreign affairs doctrine. *Von Saher*, 592 F.3d at 960-968. The Ninth Circuit determined California's extension of the statute of limitations, at its core, concerned restitution for injuries inflicted by the Nazi regime. *Id*. at 967. While states are usually free to govern issues related to the return of property, the Ninth Circuit determined that California's special concern with this type of property actually infringed upon exclusively federal interests. *Id*. The state law directly implicated the federal government's singular ability deal in matters related to war and its aftermath, such as reparations and restitution. *Id*. Importantly, the HEAR Act specifically mentions the *Von Saher* case, adopting its holding as a fundamental reason underpinning the Act's importance. HEAR Act § 2(7).

Plaintiffs attempt to paint the *Von Saher* decision as one about preemption, rather than jurisdiction. (Reply, at 7.) To a degree, their limited reading is factually correct; however, Plaintiffs' reading fails to see *Von Saher* as part of the bigger picture. The Court in *Von Saher* found preemption appropriate because the state statute impeded an exclusively federal domain. Finding in favor of remand, as Plaintiffs urge us to do, would be akin to deciding the federal government does not have a substantial interest in deciding cases that implicate its exclusive domain. We fail to see the logic in such a position, and decline to decide as much. Accordingly, we determine the application of the HEAR Act implicates issues substantial to our federal system by virtue of the important policies underscoring the reasons for the Act.

**D.   Resolution of the Issue Would Not Disrupt the Federal-State Balance Approved by Congress**

We agree that resolution of the aforementioned issues would not disrupt any federal-state balance of power established by Congress. Congress enacted the HEAR Act in recognition that "[f]ederal legislation is . . . necessary to ensure that claims to Nazi-confiscated art are adjudicated in accordance with United States policy" and "not unfairly barred by [state] statutes of limitations." HEAR Act § 2(7), § 3(2). Congress thus enacted the Act as a way of reconfirming the federal government's interest in providing a statutory framework for dealing with the return of property lost and stolen due to events of the Holocaust. As previously expressed, this interest in reparations and restitution remains singularly federal; thus, adjudicating this case in federal court does not contravene any intention by Congress to keep cases like this in state court. Further, the HEAR Act is implicated in a small, discrete set of circumstances and thus "will portend only a microscopic effect on the federal-state division of labor." *Grable*, 545 U.S. at 315. Thus, we conclude the resolution of the attendant issues will not disrupt and federal-state balance approved by Congress.

**IV.   CONCLUSION**

The atrocities of the Holocaust were undeniable. The persecution of millions at the hands of a few is a stain forever tarnishing our collective history. Determining the Trust's claim to the Painting within the special laws the United States has created for such necessary reparations will be outcome determinative. We determine the application of the HEAR Act satisfies the *Grable* factors such that this issue may proceed before this court. For the foregoing reasons, we deny Plaintiffs' motion to remand and conclude Plaintiffs' reliance on the HEAR Act implicates a federal question such that this Court possesses subject matter jurisdiction. An appropriate order follows.

**BY THE COURT:**

*/s/ John Milton Younge*

**Judge John Milton Younge**