**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JASON MCMANUS HOLTZMAN,
as Trustee of The Elizabeth McManus Holtzman
Irrevocable Trust, 29 Merriwold Lane
Deep River, Connecticut 06417

JACKIE MCMANUS HOLTZMAN,
as Trustee of The Elizabeth McManus Holtzman
Irrevocable Trust, 28 Clark Hill Road
East Haddam, Connecticut 06423

and

MADALENA MCMANUS HOLTZMAN,
as Trustee of The Elizabeth McManus Holtzman
Irrevocable Trust, 63 Commerce Street
Clinton, Connecticut 06413

        **Plaintiffs**,

    v.

PHILADELPHIA MUSEUM OF ART,
2600 Benjamin Franklin Pkwy,
Philadelphia, PA 19130

        **Defendant**.

Civil Action No. 22-cv-00122-JMY

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Jason McManus Holtzman, Jackie McManus Holtzman, and Madalena McManus Holtzman, as Trustees of The Elizabeth McManus Holtzman Irrevocable Trust (the "Trust"), through their undersigned attorneys, upon knowledge with respect to themselves, their own acts, and certain of the acts of Defendant, and upon information and belief as to all other matters, allege against Defendant Philadelphia Museum of Art, as follows:

1

## **NATURE OF THE ACTION**

1.      Plaintiffs, as successors in interest to the renowned Dutch artist Piet Mondrian ("Mondrian"), seek recovery of one of Mondrian's important works of art *Schilderij No. 1*, 60 x 60 cm, 1926 ("B173")[1] (the "Painting").

2.      Mondrian is regarded as one of the greatest artists of the 20th century and was a leading innovator of abstract art.  He created the Painting in 1926 and shortly thereafter consigned it for sale. Upon information and belief, in 1927, the consignee entrusted the Painting to the director of a museum in Hanover, Germany before she left for Russia.

3.      By 1933, the Nazi regime was established in Germany.  In 1937, the Nazis embarked on a program designed to purge Germany of so-called "degenerate art," *i.e.*, modern artworks that included works by Mondrian.  The artists who created these works, including Mondrian, were also persecuted and designated "degenerate." Pursuant to the Nazi program to eliminate all such paintings, more than twenty thousand modern artworks were seized from German public museums, including the Painting.

4.      After the Painting was unlawfully seized, the Nazis sold it in 1939.  The Painting was never returned to Mondrian, and he never received compensation for its wrongful sale.

5.      The Painting is currently in the wrongful possession of the Philadelphia Museum of Art (the "PMA").

---

[1] The Painting is identified here in accordance with the system used in the catalogue raisonné of Mondrian's works, a comprehensive, annotated listing of all the known works of Mondrian, maintained by the RKD (Netherlands Institute for Art History), available at http://pietmondrian.rkdmonographs.nl/ ("RKD Catalogue Raisonné").  The RKD retains the numbering system used in Joop M. Joosten, Robert P. Welsh, *Piet Mondrian: Catalogue Raisonné of the Work of 1911-1944* (1998) ("Joosten Catalogue Raisonné").  Numbers preceded by a "B" are works created by Mondrian from 1911-1944.

**THE PARTIES**

6.      Plaintiff Jason McManus Holtzman is a United States citizen who resides at 29 Merriwold Lane, Deep River, Connecticut 06417 and a Trustee of the Trust.

7.      Plaintiff Jackie McManus Holtzman is a United States citizen who resides at 28 Clark Hill Road, East Haddam, Connecticut 06423 and a Trustee of the Trust.

8.      Plaintiff Madalena McManus Holtzman is a United States citizen who resides at 63 Commerce Street, Clinton, Connecticut 06413 and a Trustee of the Trust.

9.      Defendant Philadelphia Museum of Art is a domestic non-profit corporation created under the laws of the State of Pennsylvania and operating as a public museum located at 2600 Benjamin Franklin Pkwy, Philadelphia, Pennsylvania 19130.

**JURISDICTION AND VENUE**

10.      On December 10, 2021, Plaintiffs filed their complaint in the Philadelphia Court of Common Pleas based on Plaintiffs' belief that the state court had jurisdiction and venue was proper pursuant to Pa. R. Civ. P. 1006 and 2179(a).

11.      Defendant Philadelphia Museum of Art filed a notice of removal on January 11, 2022.

12.      On February 28, 2022, Plaintiffs moved to remand this action to state court.

13.       This Court held pursuant to its Order and Memorandum dated July 7, 2022 (ECF Nos. 28, 29) that it has subject matter jurisdiction over this action.

14.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(a), (b) and (c), because Defendant is a Pennsylvania non-profit corporation located in this judicial district and the Painting that is the subject of this dispute is also located in this judicial district.

15.     The Court has jurisdiction to grant the relief requested pursuant to 28 U.S.C. §§ 2201(a) and 2202.

## **BACKGROUND**

### Creation and Consignment of the Painting

16.     Mondrian was born in the Netherlands on March 7, 1872.

17.     Mondrian later moved to Paris where he resided from 1919 to 1938. While there, he developed his distinctive style of painting, which during that period was typically limited to white backgrounds, black lines, and blocks of primary colors.

18.     The Painting was created in 1926 and consigned to Sophie Küppers ("Küppers"), a prominent art dealer to whom Mondrian consigned many works.

19.     In 1927, Küppers left Germany for the Soviet Union. At the time of her emigration, she had not sold the Painting and, on Mondrian's behalf, she entrusted the Painting to Alexander Dorner ("Dorner"), the director of the Provinzialmuseum (presently "Landesmuseum") in Hanover, Germany (the "Hanover Museum"), where she had previously loaned her own Mondrian painting, B174.

20.     At the time Küppers left Germany, there were three Mondrian works in possession of the Hanover Museum:

- the Painting;
- B149, from the museum's own collection; and
- B174, on loan from Küppers.

21.     The Hanover Museum's 1930 inventory did not include the Painting.

### The Nazis Target Mondrian as a Degenerate Artist and Seize the Painting

22.     By 1937, after the Nazis had consolidated their control of Germany, Adolf Ziegler ("Ziegler"), president of the Reich Chamber of Fine Arts, spearheaded the purging of modern art and its artists, as part of the systematic campaign of the Nazis to impose an official

Nazi aesthetic and expunge the modern art and its artists that were considered a threat to a pure-blooded Aryan nation interested in preserving all aspects of society and especially its culture. The Nazis labeled the modern artworks and their artists as "*Entartet*" ("Degenerate").  The Nazis used the term to suggest that the artists' mental, physical, and moral capacities were in decay. At the time, "degenerate" was widely used to describe criminality, immorality, and physical and mental disabilities.

23.     Upon information and belief, in February 1937, to avoid detention by the Gestapo, Dorner resigned as the Hanover Museum's director and immigrated to New York via Paris the same year. Ferdinand Stuttmann, a then member of the Nazi party, replaced Dorner and became acting director of the museum.

24.     On June 30, 1937, Goebbels authorized Ziegler to select and secure "degenerate" paintings created since 1910 in possession of the Reich, the provincial governments or by the municipalities for an exhibition ridiculing these works to the German public. As a result, more than twenty thousand modern artworks were seized as "degenerate art".

25.     On July 19, 1937, the Nazis opened the *Entartete Kunst* ("Degenerate Art") exhibition in Munich, Germany, which included about 600 important artworks that were previously in the possession of thirty-two German public museum collections.  The works were assembled to identify for the German public art that was deemed abhorrent to the Nazi Party, including Mondrian's paintings. B149, the first of the three paintings by Mondrian at the Hanover Museum seized in early July 1937, was included in the exhibition, which ran until November 30, 1937.

26.     Degenerate art and its artists were victims of the Nazis genocidal campaign against the Jewish people. Joseph Goebbels ("Goebbels"), Reich Minister of Public Enlightenment and Propaganda, announced in 1937: "How deeply the perverse Jewish spirit has

penetrated German cultural life is shown in the frightening and horrifying forms of the 'Exhibition of Degenerate Art' in Munich." The Nazis considered modernism a dangerous lie perpetuated by Jews, communists, and even the insane to contaminate the body of German society. The Nazi government purged cultural organizations of Jews and others alleged to be politically or artistically suspect.

27.     On July 24, 1937, the Deutsch Allgemeine Zeitung (D.A.Z.) [German General Newspaper] published an article by art critic Bruno E. Werner with an incomplete list of the artworks exhibited in Munich. His list of artists, which included Mondrian, came to be the guideline for determining "degenerate artists."

28.     As a targeted group based on Nazi ideology, degenerate artists were also persecuted personally. Degenerate artists were prohibited from producing their art, fired from teaching positions, arrested and detained, their artworks were confiscated, exhibitions of their works were shut down, and books about them or authored by them were burned. In fear of persecution, many degenerate artists were required to flee Nazi-occupied territories or territories at threat of invasion.

29.     B174 and the Painting were also seized in August 1937 from the Hanover Museum. In preparation for their seizure, the Hanover Museum took photographs of the artworks. The back of the photograph of the Painting identified the Painting as a "loan".

30.     On August 11, 1937, the Hanover Museum's then acting director, Gert von der Osten, sent the photographs of the Painting and B174 to *Amtes fur Volksbildung* [the Office for Popular Education] along with a list of degenerate artworks to be seized ("*Liste der Verfallskunst im Besitz des Landesmuseums Hannover"*) [List of Decayed Art in Possession of the Hanover museum]. The list, which included B149, B174 and the Painting, identified the Painting as a "loan" and "property of the artist."

31.     In or about September 1937, Nazi agents shipped the Painting to and store it in Niederschönhausen in Berlin, Germany. The Reich's Chamber of Fine Arts also prepared an inventory of all seized artworks with corresponding inventory numbers (EK-Numbers [Entartete Kunst = Degenerate Art]). The inventory numbers were either applied with red or blue crayon onto the paintings' stretchers or frames, or printed on paper and affixed to the frames. To this date, the frame of the Painting still carries the sticker "EK 7035".

32.     Upon information and belief, in anticipation of war and in fear of further persecution as a degenerate artist, Mondrian, terrified, fled continental Europe in September 1938, leaving Paris for London.

<u>Nazi Art Dealer Curt Valentin Sells the Painting to Albert E. Gallatin</u>

33.     At the time Mondrian was living in exile in London, the Reich Ministry of Public Enlightenment and Propaganda transferred possession of the Painting to Karl Buchholz ("Buchholz"), one of Hitler's art dealers appointed to sell degenerate art.

34.     Buchholz sent the Painting to his New York-based business partner Curt Valentin, who, also authorized by the Nazis to sell degenerate art, sold the Painting to a collector, Albert E. Gallatin ("Gallatin") located in New York, on or about August 24, 1939. Upon information and belief, the Painting was sold with another oil painting by El Lissitzky for the total price of $220.

35.     Shortly after Gallatin acquired the Painting, on October 28, 1939, he announced his acquisition of two works of modern art, including the Painting, that were removed from the walls of German museums by the Nazis, and which were to be "held in trust for the German people." He also stated that "if the German people re-established a democratic form of government and wanted the pictures back, he would return them to the German museums." Thus,

Gallatin believed that the Painting at the time that he acquired it belonged to the Hanover Museum.

### Mondrian Flees Europe for New York

36.     Mondrian wrote to his artist friend Barbara Hepworth in July 1940, shortly after the fall of Paris to the Nazis in June of that year: "The great danger for us is about our work; might the Nazis come in; what then?"

37.     In September 1940, after the windows of his London apartment were blown in due to nearby bombing, Mondrian fled to New York.  Upon information and belief, shortly thereafter, in October 1940, a Nazi bombing raid destroyed the two houses next door to his London apartment.

38.     Upon information and belief, Mondrian restored the Painting for Gallatin in or around December 1940. At the time, he did not know that he could lay claim to the Painting, which he believed had been lawfully acquired by Gallatin.

### Mondrian Dies and Holtzman Is His Sole Heir

39.     Harry Holtzman, an abstract painter who had met Mondrian in Paris in 1934, sponsored Mondrian's immigration into the United States and became one of Mondrian's closest friends and colleagues.

40.     On February 1, 1944, Mondrian died unexpectedly of pneumonia, never having learned that he still had good title to the Painting.

41.     In his will dated April 16, 1942, Mondrian devised and bequeathed "all works pictures drawings and writings of mine and all my other property real personal and mixed and wheresoever situated to my friend HARRY HOLTZMAN."

### The Painting is Gifted to the PMA

42.     In 1952, Gallatin bequeathed the Painting to the PMA.

43.     Upon information and belief, the Painting has remained in the custody of the PMA to this day. The PMA's online provenance for the Painting is published at https://philamuseum.org/collection/object/53954.

### Harry Holtzman's Death and Creation of the Trust

44.     Upon information and belief, Holtzman died on September 25, 1987, survived by his wife, Elizabeth McManus Holtzman, and his three children, who are Plaintiffs in this action.  Upon information and belief, he died without learning that Mondrian, and thus he, owned the Painting.

45.     In November 1991, Elizabeth McManus Holtzman created the Trust, delivering the remainder of Holtzman's estate to Holtzman's children, as trustees, and Plaintiffs in this action.  Thus, the Trust holds the remainder of Mondrian's estate, including all his right, title and interest in and to the Painting. The Trustees did not know that they had a claim to the Painting.

### Plaintiffs Learn of Their Ownership Interest in the Painting

46.     For a period of time up to and including February 2016, Dr. Monika Tatzkow ("Tatzkow"), a provenance researcher, and Gunnar Schnabel ("Schnabel"), a German attorney and researcher, were independently researching the provenance of other Mondrian paintings that had belonged to Küppers and her husband, El Lissitzky, and had been lost during the Nazi Era.  They approached Plaintiffs at this time to offer to investigate the provenance of paintings consigned by Mondrian that may have been lost during the Nazi era.  Plaintiffs retained them to do so.

47.     After researching the history and provenance of the Painting, Tatzkow and Schnabel determined that at all times Mondrian remained the owner of the Painting, that it was wrongfully seized by the Nazis, and that the PMA never lawfully acquired ownership of the

Painting.

48.     These conclusions were incorporated in an Expert Opinion dated February 28, 2018 (the "Expert Opinion"), which was sent to Plaintiffs on March 9, 2018.

49.     Schnabel submitted the Expert Opinion to the PMA on or about April 14, 2018.

50.     After exchanges of correspondence between Schnabel and the PMA and its counsel, on November 10, 2021, Kaye Spiegler PLLC, acting on behalf of the Plaintiffs, demanded the return of the Painting.

51.     On November 24, 2021, the PMA, through its counsel, rejected Plaintiffs' demand.

<u>Plaintiffs' Claims are Timely</u>

52.     This action is timely pursuant to the Holocaust Expropriated Art Recovery Act of 2016 ("HEAR Act").

53.     The HEAR Act provides:

(a)  IN  GENERAL.—Notwithstanding  any  other  provision  of Federal or State law or any defense at law relating to the passage of time, and except as otherwise provided in this section, a civil claim or cause of action against a defendant to recover any artwork or other property that was lost during the covered period because of Nazi persecution may be commenced not later than 6 years after the actual discovery by the claimant or the agent of the claimant of—
        (1) the identity and location of the artwork or other property; and
        (2) a possessory interest of the claimant in the artwork or other property.

            *        *        *

(c)  PREEXISTING CLAIMS.—Except as provided in subsection (e), a civil claim or cause of action described in subsection (a) shall be  deemed  to  have  been  actually  discovered  on  the  date  of enactment of this Act if—
        (1) before the date of enactment of this Act—

> (A) a claimant had knowledge of the elements set forth in subsection (a); and
> (B) the civil claim or cause of action was barred by a Federal or State statute of limitations; or
> (2)(A) before the date of enactment of this Act, a claimant had knowledge of the elements set forth in subsection (a); and
> (B) on the date of enactment of this Act, the civil claim or cause of action was not barred by a Federal or State statute of limitations.

54.     As defined in the HEAR Act, "covered period" means "the period beginning on January 1, 1933, and ending on December 31, 1945;" "actual discovery" means "having actual knowledge of a fact or circumstance or sufficient information with regard to a relevant fact or circumstance to amount the actual knowledge thereof;" and "Nazi persecution" means "any persecution of a specific group of individuals based on Nazi ideology by the Government of Germany, its allies or agents, members of the Nazi Party, or their agents or associates, during the covered period."

55.     The HEAR Act was enacted to address the millions of objects that were "unlawfully and often forcibly taken from their rightful owners, who included private citizens, victims of the Holocaust; public and private museums and galleries; and religious, educational, and other institutions." S. Rep. No. 114-394 at 2 (2016). Congress found that "[t]he Nazis persecuted many groups, and that persecution was executed by the Nazi Party, the government of Germany at the time, governments allied with Germany, private agents and others." *Id.* at 9. The defined term "Nazi persecution" "is intended to be broad, to facilitate the restitution of art and other cultural property lost [between January 1, 1933 and December 31, 1945]." *Id.*

56.     The Painting was lost between January 1, 1933 and December 31, 1945 as a result of Nazi persecution of "Degenerate" art and its artists, including Mondrian.  This action was commenced not later than six years after Plaintiffs had actual knowledge of both the identity and location of, and their possessory interest in, the Painting; or, alternatively, Plaintiffs had

actual knowledge of both the identity and location of and their possessory interest in the Painting before the date of enactment of the HEAR Act (December 16, 2016) and this action was commenced not later than six years after the date of its enactment.

57.     In the alternative, if Pennsylvania's statute of limitation should apply, this action was commenced no later than two years after the PMA's November 24, 2021 refusal of Plaintiffs' November 10, 2021 demand for return of the Painting.

## FIRST CLAIM
### (Replevin)

58.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 57 of this Complaint as if fully set forth herein.

59.     Plaintiffs are the rightful owners of the Painting and are entitled to sole and immediate possession thereof.

60.     Defendant never acquired ownership of the Painting but holds it only for the benefit of Mondrian and his successors in interest, including Plaintiffs.

61.     The Painting is a unique and irreplaceable work of art.

62.     Plaintiffs have no adequate remedy at law.

63.     Plaintiffs demanded the return of the Painting, and Defendant failed and refused to deliver the Painting to Plaintiffs.  Any further demand would have been futile.

64.     Plaintiffs are entitled to the immediate return of the Painting.

## SECOND CLAIM
### (Conversion)

65.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 64 of this Complaint as if fully set forth herein.

66.     Plaintiffs are the rightful owners of the Painting and entitled to sole and immediate possession thereof.

67.     Defendant never acquired ownership of the Painting but holds it only for the benefit of Mondrian and his successors in interest, including Plaintiffs.

68.     Plaintiffs demanded the return of the Painting, and Defendant failed and refused to deliver them to Plaintiffs.  Any further demand would have been futile.

69.     Defendant converted and appropriated the Painting in complete disregard and derogation of the Plaintiffs' right, title and interest in and to the Painting.

70.     Plaintiffs have been damaged by the conversion of the Painting and are entitled to damages in an amount to be determined at trial, but estimated to be in excess of $100 million.

## THIRD CLAIM
### (Unjust Enrichment)

71.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 70 of this Complaint as if fully set forth herein.

72.     Plaintiffs are the rightful owners of the Painting.

73.     Defendant accepted the Painting in 1952 as a gift.

74.     Defendant possesses the Painting and, therefore, receives a benefit from Plaintiffs so long as the Painting remains with Defendant.

75.     Plaintiffs demanded the return of the Painting, and Defendant failed and refused to deliver them to Plaintiffs.  Any further demand would have been futile.

76.     Defendant possesses the Painting in complete disregard and derogation of the Plaintiffs' right, title and interest in and to the Painting.

77.     It is inequitable for Defendant to continue to benefit from retention of the Painting without payment.

78.     The Painting is a unique and irreplaceable work of art.

79.     Plaintiffs have no adequate remedy at law.

80.     Plaintiffs are entitled to restitution, obligating Defendant to return the Painting or compensate Plaintiffs for Plaintiffs' interest in the Painting in an amount to be determined at trial, but estimated to be in excess of $100 million.

## FOURTH CLAIM
### (Declaratory Relief)

81.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 80 of this Complaint as if fully set forth herein.

82.     Plaintiffs are the rightful owners of the Painting and entitled to sole and immediate possession thereof.

83.     Defendant does not have good title to the Painting.

84.     Defendant's express claim of title to and or right to possess the Painting creates an actual controversy with Plaintiffs over the ownership of the Painting.

85.     Plaintiffs are entitled to a judgment pursuant to 42 Pa.C.S. § 7531, et seq. and 28 U.S.C. §§ 2201 and 2202 declaring that all right, title and interest in and to the Painting is vested in Plaintiffs, and Defendant has no right, title or interest in and to the Painting.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendant as follows:

a)     on the First Claim, directing that Defendant immediately deliver the Painting to Plaintiffs;

b)     on the Second Claim, awarding Plaintiffs damages, in an amount to be determined at trial, but estimated to be in excess of $100 million;

c)     on the Third Claim, declaring that Plaintiffs are entitled to restitution, and directing that Defendant return the Painting to Plaintiffs or, in the alternative, that Defendant compensate Plaintiffs' interest in the Painting in an amount to be determined at trial, but estimated to be in excess of $100 million;

d)      on the Fourth Claim, awarding a declaratory judgment that all right, title and interest in and to the Painting is vested in Plaintiffs, and that Defendant has no right title or interest in and to the Painting;

e)      awarding pre- and post-judgment interest;

f)      awarding Plaintiffs' fees and costs pursuant to Fed. R. Civ. P. 54(d); and

g)      awarding such other relief as the Court deems just and proper.

Dated:  August 10, 2022                         Respectfully submitted,

                                                TUCKER LAW GROUP

                                                By: /s/ Joe Tucker
                                                _____

                                                Joe H. Tucker, Jr., Esquire
                                                Jessica A. Rickabaugh, Esquire

                                                KAYE SPIEGLER PLLC

                                                By: /s/ Lawrence M. Kaye
                                                _____

                                                Lawrence M. Kaye, Esquire
                                                (Admitted *Pro Hac Vice*)
                                                Howard N. Spiegler, Esquire
                                                (Admitted *Pro Hac Vice*)
                                                Gabrielle C. Wilson, Esquire
                                                (Admitted *Pro Hac Vice*)

                                                *Attorneys for Plaintiffs Jason McManus
                                                Holtzman, Jackie McManus Holtzman, and
                                                Madalena McManus Holtzman, as Trustees of
                                                The Elizabeth McManus Holtzman
                                                Irrevocable Trust*

## CERTIFICATE OF SERVICE

I, Jessica A. Rickabaugh, Esquire, do hereby certify that I caused to be served a true and correct copy of Amended Complaint and Demand for Jury Trial to the following:

### Via ECF and Electronic Mail:

Steven Maniloff, Esq.
Montgomery, McCracken, Walker & Rhoads, LLP
1735 Market Street, 21st Floor
Philadelphia, PA 19103
smaniloff@mmwr.com

Stephen J. Knerly, Jr., Esq.
Hahn Loeser & Parks LLP
200 Public Square, Suite 2800
Cleveland, OH 44114
sjk@hahnlaw.com

Reid M. Figel, Esq.
L. Vivian Dong, Esq
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
Sumner Square, Suite 400
1615 M Street, N.W.
Washington, D.C. 20036
rfigel@kellogghansen.com
vdong@kellogghansen.com

*Attorneys for Defendant*

**TUCKER LAW GROUP, LLC**

Dated: August 10, 2022            /s/ Jessica A. Rickabaugh
                                  Jessica A. Rickabaugh, Esquire